**Louis B.C. FONG, Plaintiff,**

v.

**James M. BEGGS,\* Administrator, National Aeronautics and Space Administration, Defendant.**

**Civ. A. No. 78–0928.**

United States District Court, District of Columbia.

July 31, 1985.

Joel P. Bennett, Washington, D.C., for plaintiff.

Diane M. Sullivan, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

This action, brought by the named plaintiff, Louis B.C. Fong, on behalf of himself

---

\* Pursuant to Fed.R.Civ.P. 25(d), James M. Beggs, Administrator, National Aeronautic and Space Administration, has been substituted for Robert A. Frosch, Administrator.

and nine other similarly situated employees,[1] arises under the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621, *et seq.*[2] Essentially, the plaintiffs assert that the defendant, the Administrator of the National Aeronautics and Space Administration (NASA), abused his discretion concerning 1977 salary adjustments for these NASA excepted employees at Headquarters, and that those decisions were in violation of the Act since predicated on age; and further, that job retention and other conditions of employment were endangered or diminished as a consequence of this discrimination. Additionally, they contend that relegated to "career obsolescence", divested of opportunities to advance their already successful careers and diluted in prestige, they were also deprived of back pay resulting from lost wages, that is, the difference between their salary levels on February 27, 1977 and the salary they were entitled to receive had the defendant's actions not occurred. Among relief requested, plaintiffs seek compensation for the above lost wages, pension rights with retroactive adjustment of all commensurate benefits related thereto, compensatory and liquidated damages and an order in the nature of an affirmative action plan designed to rectify the alleged discriminatory actions of the defendant.

Denying that age was a factor in any of its actions towards plaintiffs, the NASA asserted that the claimants were entitled only to that salary fixed by the Administrator in his discretion and under statutory authority, pursuant to which each plaintiff was appointed.

For reasons demonstrated by the findings of fact and conclusions of law noted herein, the Court concludes that Louis B.C. Fong, and the nine other similarly situated employees he represents, have not prevailed on the claim of age discrimination and that judgment must, accordingly, be entered in favor of the defendant.

At the time of litigation all the plaintiffs were or had been long service employees, holding administratively determined (AD) positions at NASA Headquarters in Washington, D.C., assigned to Code E (the Office of Space and Terrestrial Applications) or Code S (the Office of Space Science). They had served, and in almost all cases continued to serve, in excepted positions pursuant to the provisions of the National Aeronautics and Space Act of 1958, as amended, 42 U.S.C. § 2473(c)(2).[3] The majority of

1. The plaintiff sued "on behalf of himself and as representative of other parties in interest who are similarly situated and are employed in the federal service who held or are holding excepted positions as employees of National Aeronautics and Space Administration (NASA) at its Headquarters location in Washington, D.C." See Amended Complaint.

   Nine other parties in interest specifically authorized Mr. Fong to represent them and bring this suit on their behalf: Marcel J. Aucremanne; William E. Brunk; Michael L. Garbacz; Earl W. Glahn; Samuel H. Hubbard; Fred D. Kochendorfer; Jules Lehmann; Jerome D. Rosenberg; and Erwin R. Schmerling.

   Although there is but a single plaintiff (Fong), for simplicity and ease of reference when incorporating the positions or status of all the persons hereunder represented, they will be referred to as plaintiffs or claimants.

2. The Age Discrimination in Employment Act of 1967 (ADEA), codified at 29 U.S.C. §§ 621–634, proscribes employment discrimination based on age, reflecting the Congressional determination to protect older workers against discrimination in the workplace on the basis of age. Originally limited in protection of employees in the private sector, 29 U.S.C. § 630(b), the scope of the Act was extended in 1974 when Congress provided protection to federal employees as well, over 40 years of age, 29 U.S.C. § 623(a):

   "All personnel actions affecting employees or applicants for employment who are at least 40 years of age (except personnel actions with regard to aliens employed outside the limits of the United States) in military departments as defined in section 102 of Title 5, in executive agencies as defined in section 105 of Title 5 (including employees and applicants for employment who are paid from nonappropriated funds), in the United States Postal Service and the Postal Rate Commission, in those units in the government of the District of Columbia having positions in the competitive service, and in those units of the legislative and judicial branches of the Federal Government having positions in the competitive service, and in the Library of Congress shall be made free from any discrimination based on age."

3. 42 U.S.C. § 2473(c):

these employees had entered the federal career competitive service at lower grade levels, progressed to the GS–16 level and, as recently as 1974, were converted to excepted positions.

The NASA pay system differed from that conventionally applied in the federal government, using GS grades through GS–15, with only "non-quota" GS–16, restricted to a limited few illustrious scientific persons. Under its statutory provisions the Administrator could appoint 425 individuals (excepted personnel) and set their compensation (administratively determined), not to exceed the GS–18 ceiling. Under the General Schedule (GS), positions of comparable responsibility were paid an identical rate with in-step increases provided, as appropriate, over a time span.

Distinguished and lauded scientists and engineers, through education, experience, creativity and demonstrated accomplishments, our plaintiffs, individually and collectively, had provided valuable services at NASA to the development of the United States Space Program, Prior to 1977, none had ever received an unsatisfactory rating. The majority were over 50 years of age at time of their initial agency complaint; all were over 40 years of age.

The plaintiff, Louis B.C. Fong, who retired in February 1980, had been an employee of NASA at its Headquarters offices, holding an excepted position and as-

signed to Code E as an intergovernmental affairs officer.[4] In February 1977 he was 62 years of age. Prior to that time his salary was $39,600. After the salary adjustment in February 1977 he was raised to $40,000.

An electrical engineering graduate of Massachusetts Institute of Technology with a master's degree in engineering administration from George Washington University, Mr. Fong had received a coveted Brooking's Institution federal executive fellowship.

Prior to coming to NASA in 1962, when he was 48 years old, he was a mid-level GS–15. He entered into the excepted service at NASA with an approximate $1,000 increase over his prior GS level, in the expectation, subsequently realized, that the salary would be reviewed periodically (every six months to one year) and increased as appropriate.

By October 1976 he had achieved the "ceiling", that is, the $39,600 maximum salary allowable by law at that time for the excepted personnel, maintained at a rate equal to the pay ceiling for GS employees. At that time, the Federal Salary Act, 2 U.S.C. § 351, *et seq.*, increased the ceiling in the General Schedule (GS–18) from $39,-600 to $47,500.

NASA then implemented the federal executive pay adjustment (effective February

"In the performance of its functions the Administration is authorized:
(2) to appoint and fix the compensation of such officers and employees as may be necessary to carry out such functions. Such officers and employees shall be appointed in accordance with the civil service laws and their compensation fixed in accordance with chapter 51 and subchapter III of chapter 53 of Title 5, except that (A) to the extent the Administrator deems such action necessary to the discharge of his responsibilities, he may appoint not more than four hundred and twenty-five of the scientific, engineering, and administrative personnel of the Administration without regard to such laws, and may fix the compensation of such personnel not in excess of the highest rate of grade 18 of the General Schedule, and (B) to the extent the Administrator deems such action necessary to recruit specially qualified scientific and engineering talent, he may establish the entrance grade for scientific and engineering personnel

without previous service in the Federal Government at a level up to two grades higher than the grade provided for such personnel under the General Schedule, and fix their compensation accordingly."

**4.** In his resumé, Mr. Fong described his work as "currently engaged in staff actions and support of policy and programmatic matters dealing with·other Federal agencies and coordinating on such matters as atmospheric sciences research, water resources research, environmental quality, and earth resources disciplines. Contacts with other agencies is at policy and decision making level on a regular basis. Serve also as the Executive Secretary of the Applications Steering Committee, the final reviewing body on applications missions, payloads and investigations and as agency focal point for the Space Program Advisory Council Applications Committee and the National Research Council, Space Applications Board." PX 38.

1977) for executives who had been held at the pay ceiling for years. The General Schedule competitive service personnel received these increases automatically. The increase for the excepted personnel, to a maximum of $47,500, was at the discretion of the Administrator.

Aware of some management activity concerning the matter, Mr. Fong was uncertain of the increase he would receive. He expected, as always in the past (with one exception) to be raised to the maximum. Instead, his adjustment was minimal, only $400.00, and did not approach the pay ceiling then applicable.

Concerned their good records of achievements were not being recognized appropriately, and suspecting that inequities were resulting between the increases given "excepteds" in Codes E and S and those in other code organizations,[5] Mr. Fong and two other scientists[6] similarly disillusioned, complained initially to Dr. James C. Fletcher, then Administrator. Dr. Fletcher indicated that for the first time, with a potential twenty percent salary increase to $47,500, the agency had the opportunity to place persons at varying, but appropriate, levels of pay. Dissatisfied with this response, Mr. Fong continued to question why excepted personnel in Code E (like Fong and Lehmann) received only one percent increases and a management person in Code T with apparently similar responsibilities, received the full twenty percent adjustment. Although no other NASA excepted was exactly equivalent, he compared his situation to an employee who received the ceiling in his non-technical budget office capacity.

Later, Mr. Fong contacted Dr. John E. Naugle[7] who indicated he would support the recommendation of the salary committee.

On March 24, 1977, ten Headquarters employees,[8] all between 40 and 62 years of age, filed a complaint of age discrimination with the EEO counselor, denominating it a class action based on the February, 1977 salary adjustment. Contending that the adjustment had created an inequity in the pay level between those ten excepted personnel and employees with comparable duties in other divisions of NASA, they emphasized their demoralization in not being granted commensurate and automatic pay increases as senior GS employees received.[9]

Subsequently formalized as an administrative class complaint (PX 217–I), the claimants alleged that management's recent pay decisions providing senior excepted service personnel in Codes E and S substantially less than their peers in the other technical program offices of NASA (Codes M, R and T), were the direct result of age discrimination. They asserted that without criteria and without a uniform approach, NASA had denied them equal pay for equal work, since, in their view, "the level, quantity, breadth of responsibility and complexity of work are comparable in all these major program areas." (Id., Supp.Sh. No. 1.) They sought the pay increase retroactive to February 1977, in the amount "they would have received at the GS supergrade equivalent levels they had

---

5. The other relevant program offices were the Office of Space Flight (Code M), the Office of Aeronautics and Space Technology (Code R) and the Office of Tracking and Data Acquisition (Code T).

6. Voicing similar concerns, Michael L. Garbacz and Earl W. Glahn had each approached Mr. Fong in his capacity as co-chairman of the NASA Headquarters Equal Employment Opportunity Advisory Group (EEOAG); they joined Fong in the discussion with Dr. Fletcher.

7. At that time Dr. Naugle was the Associate Administrator.

8. Mr. Fong and eight of the nine persons he represents in the instant case participated in that complaint. One signator of that complaint is not involved in this litigation. Dr. Schmerling, not part of the complaint, is one of the claimants in this suit.

9. Four of the ten who joined in the complaint (Garbacz, Glahn, Brunk and Kochendorfer) had an additional grievance, asserting they were GS–16s who had been unilaterally and illegally converted by NASA to excepted positions.

attained prior to the imposition of pay ceilings or which they would have received as GS–16 had they not been involuntarily converted to excepted service." PX 217, App. J.

Another counselor joined in the investigation of the grievance; they attempted informal resolution, meeting with the Associate Administrators of each of the claimants. Samuel Keller, Assistant Administrator for Personnel Programs, was designated as the focal point for executive pay information and advised the counselors that the executive pay levels were based upon the difficulty of the job and the incumbent's performance in that work. The counselors submitted their report in July 1977, PX 217, reflecting that the complaint had not been informally resolved.

Pursuant to 1973 agency policy, NASA Management Instruction (NMI) 3100.1A, the assessment of excepted service personnel for purpose of pay increase was based on the individual's qualifications and performance, not on the position. While recognizing that some directors in Code E had not received the same pay raise as directors in other program offices, the claimants had initially attributed this difference to the inexperience of their Associate Administrator (who had been in position only a few months) and the oversight of the salary committee. Later it appeared to them, in a reversal of past application, that the new salary levels were based on the position, its function and title, and not on the individual's work. They became more convinced than ever that the determinations were predicated on age. They began to generate statistical data to support this premise.

Mr. Fong pursued the matter further, discussing it with Dr. Alan M. Lovelace, former Deputy Administrator and later, successor to Dr. Fletcher who left the agency. Although Mr. Fong did not receive a satisfactory salary adjustment in early 1977, Dr. Lovelace subsequently recommended him for a $2,800 increase, a sum halved by Dr. Calio to $1,400.

The matter of age, raised only inferentially in the earliest discussions with Dr. Fletcher, had become increasingly the focus of claimants' concern.[10] Since all the claimants had unblemished records and most had received career awards with special achievement recognition,[11] and constant raises, they could not find an acceptable explanation for their disappointing (small or nonexistent) salary adjustments. They concluded that age was the only reason—all members of the class in Codes E and S being above 40.

While the complaint and investigation were underway, Fong and Garbacz contacted two Congressmen, seeking the facts and hoping that pressure would be brought on the Administrator to achieve some kind of favorable salary adjustment.

Responding to a Congressman's inquiry, NASA advised that the salaries of its "supergrade-level" excepted employees were adjusted after a long existing salary compression. Based on the responsibilities and performance of each individual, that pay-setting was in the sole discretion of the Administrator. The agency referred to the extensive review undertaken by senior management, where each individual was evaluated. The Administrator made his decision after recommendations of his senior advisers.

**10.** In his capacity as co-chairman of the EEO Advisory Group, Mr. Fong had earlier considered that age discrimination complaints were on the rise at the agency. One of the EEO counselors suggested age as a possible reason for the disputed salary adjustments.

**11.** Among other tributes to his performance, Mr. Fong was the recipient of the EEO Award to "an individual who has always performed as a professional ...", PX 43. In 1968 he had re-

ceived a letter of appreciation from Vice President Hubert Humphrey for his earlier, valuable contributions, to the Marine Sciences Council. PX 212. In 1978, more than 18 months after the salary adjustment, Administrator Frosch conveyed to Mr. Fong the declaration of appreciation of the Inventions and Contributions Board for his "outstanding service" as a member of that Board from 1973–78, PX 42.

Of the 382 individuals occupying excepted positions, 168 had their salaries established at the $47,500 level. An additional 108 were established at either $46,300 or $45,000. The remaining 106 were distributed in the lower ranges. Considering the pay spread found in the General Schedule supergrade positions, this is believed to be a reasonable distribution, reflective of both job responsibilities and individual performance.

PX 2, at 2.

While NASA concurred that those GS–16 appointees who were converted to excepted positions did retain the rights and benefits common to all competitive systems, it was adamant that no assurance had been given anyone that he would continue to receive the same salary as if occupying a GS–16 position. Under the excepted status, none had a right to automatic salary increase.

In November 1977, the Complaints Examiner appointed by the United States Civil Service Commission (CSC), recommended as an EEO class complaint the issue of whether age was a factor in the salary determinations for AD employees in Codes E and S.

Through its Director of Equal Opportunity, NASA adopted those recommendations, modifying only the age of the class to "at least 40 years of age."

Thereafter, the agency proceeded to process the age discrimination issue. An administrative hearing was held, during which time this case was filed. On August 15, 1978, NASA adopted the recommended decision of the Complaints Examiner who found no discrimination, in the absence of evidence on which to conclude age was a factor in the salary setting decisions.

The early stages of the instant litigation had already commenced. Thereafter extensive discovery was undertaken: eight sets of interrogatories (totalling hundreds, perhaps thousands of questions), eight sets of requests for documents (totalling hundreds of documents), multiple requests for admissions and fifteen depositions. The case culminated in a bench trial of over one week, during which time numerous witnesses testified, some stipulations were reached and hundreds of exhibits were admitted.

It is appropriate to review here the experience and qualifications of each of the nine other parties in interest, represented in their common cause and complaint by the plaintiff Fong.

Employed at NASA Headquarters and holding an excepted position, Marcel J. Aucremanne was 53 years old and earning $37,800 in February 1977. He was assigned to Code S as Program Manager for Space Telescope. Despite the salary adjustments of February 1977 his salary remained without increase.

An electrical engineering graduate of the University of Notre Dame (B.S. and M.S.), he served briefly as a part-time instructor in the engineering department at the University. Later he worked for private industry as an electronics engineer. His government service commenced at the Naval Ordnance Laboratory where he remained for eight years. In 1959, at age 36, Mr. Aucremanne began his association with NASA as a GS–14 aeronautic research scientist working on the early Explorers missions; subsequently, he became Program Manager for Orbiting Geophysical Observatories where he was also responsible for the Pioneer program. From 1968–76 he was Program Manager, Advanced Programs and Technology and also (for four years of this period) study manager for the Large Space Telescope. In 1974 he was converted, with no change in title or salary, from his GS–16 position to an excepted position. The excepted personnel comprised an elite corps and he did not protest this appointment. In 1976 he became Program Manager, Space Telescope,[12] at a salary of $37,800,

---

12. Mr. Aucremanne was responsible for the implementation and direction of this program, reporting to the Director of Astrophysics Program, whose overall responsibility included coordinating and directing plans for the development of a 2.4 meter, multi-purpose, space telescope to be launched by the Shuttle, to observe galaxies at

and was serving in that capacity at the time of the adjustment in issue. From 1974 to 1977 he had at least one or two professional employees under his supervision.

His NASA honors/awards are reflected on his resume, PX 27: quality increases in 1963 and 1968, a congratulatory message in 1976 from then Vice President Humphrey on the successful launch and operation of the Orbiting Geophysical Observatory III, a 1973 group achievement award for Pioneer VI; other letters of appreciation laud his performance at NASA on steering committees and working groups. PX 258, 1958; PX 318, 1975; PX 319, 1975; PX 31, 1978.

When he learned that he would not receive a pay raise he went to his Division Chief who criticized Aucremanne's style of management, a matter on which the men admittedly "did not see eye-to-eye." Prior to October 1976, though, his job performance had not been criticized and he had received satisfactory expressions of his performance.

He considered all program manager jobs as equally important and felt that his salary adjustment should have been comparable to "people in the same category as Bill Folson, in Code T, and Belcher, Code T [who each received $43,600]."

Concerned that there appeared to be an "age consciousness" and agency trend since 1974 towards hiring the younger people, when Dr. Hinners at age 39 became head of the Office of Space Science, Mr. Aucremanne, the oldest in the Division in February 1977, suspected that age may have been a consideration in the salary adjustment.

He could have remained in the excepted service, but, because of his failure to receive the salary increase, he sought and accepted reassignment in August 1977 from his excepted position (which embraced a sizeable program) to assumption of lesser responsibilities in the competitive service as a GS-14/10 Program Manager of Opera-

greater distances than that which could be done

tion Satellite in the Astro-Physics Division in the Office of Space Science. He retired from this post, and NASA, in February, 1980, having served nearly 21 years with the agency.

William E. Brunk, 48 years of age and earning $37,800, was employed at NASA Headquarters holding an excepted position in February 1977. He was assigned to Code S as Program Chief, Planetary Astronomy. His salary remained unchanged when the salary adjustments of February 1977 took place.

Receiving his doctorate in astronomy from Case Institute of Technology on educational leave while employed by the government, Dr. Brunk was subsequently transferred to NASA as a GS-11.

With NASA since its birth in 1958, he worked on spacecraft orbits and trajectories, utilizing his background in mathematics and astronomy, and assisted in planning and developing a national program in planetary astronomy. He came to NASA Headquarters at age 36, working for the Lunar and Planetary Programs Office. Promoted to a GS-16 after twelve years, he was involuntarily transferred in 1974 at the GS-16/5 level to an excepted category; he was 45 years old. His title and salary ($36,000) remained the same. The transfer from GS to excepted personnel was "to create a more lean and effective work force and to achieve the best possible ratio and internal alignment of executive positions", PX 35. He was told that he was "serving in a position in the Competitive Service and acceptance of the above conversion will not result in your leaving the Competitive Service. This means that the Civil Service Act and other laws applying to Competitive Service positions will apply to you during your service in this excepted position." Id. Not among those who subsequently charged this conversion as an adverse action, Dr. Brunk did not formally protest his appointment as an excepted.

Since becoming Program Chief for Planetary Astronomy in 1965, as a one-man of-

from ground-based observatories. PX 29.

fice, Dr. Brunk managed and controlled a supporting research and technology program consuming an appropriation in 1977 of 5.0 million dollars. The program involved an annual level of some 45 grants with universities and approximately 10 tasks with NASA and the Jet Propulsion Laboratory. The objective of this national research was to increase knowledge of the solar system by observation of the planets and their satellites, as made from the Earth. Additionally, Dr. Brunk was responsible for the total NASA funding and monitoring of major astronomical instruments: 4.9 million dollar University of Texas telescope completed in 1969; 3.0 million dollar University of Hawaii telescope completed in 1971; and the 3.0 million dollar high-power S band radio system at the Arecibo Radio/Radar Telescope completed in 1974, with continuing monitoring of a major ongoing research program at each of these facilities. At the time of his agency discrimination complaint in 1977, he was program scientist and monitor for the 10.0 million dollar NASA Infrared Telescope Facility (IRTF) in Hawaii, due to become operational two years hence.

For his service on several committees and panels, where he contributed leadership and expertise, he received letters of commendation, PX 266 (1967), PX 264 (1969). Twice, in 1969 and 1971, he received quality increases, each approved by Dr. Naugle, then Associate Administrator for Space Science and Applications.

The first time he did not receive a pay increase was in October 1976 when the salary ceiling was raised from $37,800 to $39,600. When he questioned the situation, he was advised that only three of the eight excepted personnel in his Division had been increased in salary. His Director had argued strongly on his behalf for a raise, but Drs. Hinners and his Deputy, Dr. Anthony

Calio were "unhappy with the [poor] way I had managed the IRTF program", a pre-1977 criticism expressed informally. Since 1975, when he came "aboard", Dr Calio "always criticized some aspect of the program." Later, Calio decided the Office of Facilities would be responsible and ". . . I would be project scientist advisory to the project. [Still] he criticized me monthly for the management of something over which I had no control."

Significant problems had delayed construction of the facility and time and cost increased substantially.[13] Disagreements continued between Drs. Calio and Brunk, and others, concerning the direction to take, alteration of previous design and management plans, and disputed allocation of the percentage of observing time for the University of Hawaii.[14] Discussion about the situation, and eventual replacement of the telescope's $400,000 primary mirror which had cracked during polishing produced months' more delay. During some of these discussions, Dr. Calio referred to Dr. Brunk as a "liar", stating that he had never trusted him. It became evident, as Dr. Brunk testified, that these men could no longer discuss their actions civilly: "we never spoke to each other after this." See PX 327A, 327B, 327C, for further illumination.[15]

Dr. Hinners had no dissatisfaction with his performance save for the "personality conflict" that lingered between Hinners' Deputy, Calio, and Brunk: this was the reason he was not raised in salary; "this personal disagreement", Hinners advised, would have to be resolved. Dr. Brunk could not dispute that a "very strong" conflict existed, one well-known to everyone in the Office of Space Science. While he felt continually pressured, he attributed that reaction solely to Calio's attitudinal actions toward him and not to any acts of others.

---

13. Budgeted at 6.0 million dollars, it ultimately cost over 10.0 million dollars.

14. The University of Hawaii insisted on 25% for its own use; Dr. Brunk concurred. Dr. Calio did not propose to allocate any observing time to the University.

15. With evident satisfaction, Dr. Brunk emphasized at time of trial: "Now I am the manager for its operation and there has been no criticism since Dr. Calio left."

The matter of age was neither considered at this time nor discussed.

Dr. Brunk learned from his supervisor and "through the grapevine" that a salary board had been appointed and Dr. Calio had been his office's representative to that board. The board had essentially accepted the recommendations made by the various offices. As Dr. Brunk mulled over the distribution of the salary increases, he concluded that "age was probably the factor since there was no other apparent factor." He reasoned that: (1) other GS–16s, who were downgraded to GS–15 positions (at time Brunk and others were converted to excepteds) were, as a result of the February, 1977 increase, now receiving higher salaries than he; (2) that despite increased program responsibilities and greatest seniority based on years on the job, he was, nonetheless, second lowest salaried science program chief in Lunar and Planetary Programs; and (3) that most of the personnel in the lowest salaried group in the Office of Space Science were "close to or over 50" and his job responsibilities were "as great or greater" than several of those at lower ages and higher salary levels. PX 36.

Subsequently, he would respond to the inquiry of Mr. Fong, the class agent: "There have been no specific instances of age discrimination in any area other than that of salary increases. There has been no decrease in my job responsibility nor in size of budget for the program for which I am responsible. The budget has actually increased by $600,000 in FY 1977." PX 37.

Comparing his work as an excepted personnel in February 1977 to people with equivalent responsibilities, Dr. Brunk asserted he should have received an increase to $42,300; alternatively, he argued, he should have received an increase to $43,900 had he been a GS–15/10 at the time of his conversion to excepted status.

In October 1978 (when Dr. Calio had moved to another post) Brunk received the full comparability increase. In December 1978 he was given a "significant increase", to $42,750, "for no apparent reason."

Thereafter, Dr. Brunk joined the Senior Executive Service and received $44,756.

In February, 1977, when 49 years of age, Michael L. Garbacz was an employee of NASA at its Headquarters office holding an excepted position and assigned to Code E as Program Manager, Operational Meteorological Satellites. Prior to February 1977 his salary was $39,600. After the salary adjustment his salary increased to $41,000.

Graduating from the University of Illinois with a bachelor of science degree in electrical engineering, Mr. Garbacz began his federal government service with the Navy Department in 1951 as a GS–5. After seven years he was transferred to the Redstone Arsenal in Alabama to work at the GS–13 level for the Army Rocket and Guided Missile Agency as the Project Director of a Missile "A" Weapons System.

In 1960, at age 32, he was hired by NASA at GS–14 to work at Headquarters in its Program Evaluation and Control Branch, reporting directly to the Associate Administrator. The following year he received a special assignment to NASA/DOD Large Launch Vehicle Planning group. In 1962–63, as Chief, Design and Test Practices, he "formulated the initial NASA general design and test requirements for the Apollo Program as necessary to insure the achievement of a high degree of reliability for those Apollo missions." PX 49. Thereafter, in 1963, he joined the Office of Applications as an Aerospace Technologist, Flight Systems, and after several other promotions became, in 1969, at age 42, Program Manager, Operational Meteorological Satellite Program, a position he held at time of the salary adjustment in issue.

As a GS–16 at the ceiling of the pay structure and earning $36,000 annually, he was appointed to the excepted personnel, without change in role or pay, when NASA converted his position to this status in 1974.

He participated in several training programs during his tenure at NASA, including the government-wide Federal Executive Institute in 1974, a coveted opportunity lim-

ited by the number of people allowed to participate from the various agencies.

Although he had received increased salaries in the October 1975 and October 1976 determinations, which maintained his pay at a rate equal to GS employees' pay ceilings, he did not achieve the maximum possible in the February 1977 adjustment when he was increased by $1,400. With budget authority over 50 million dollars annually and two on his staff (one professional and one secretary, the former a GS–15/9 whose salary now exceeded Garbacz' by $2,000),[16] he was shocked by the "rejec-·tion". He had assumed he would be "raised along with everybody." Until this time, Mr. Garbacz testified "[A]s a career civil servant, I was a very happy, contented type."

He had progressed rapidly in NASA and had never been advised that his performance was less than satisfactory, had never been denied a pay increase nor received one lower than he thought he deserved. At the time in issue he was responsible for the planning, development and implementation of the world's first operational global weather satellite program, which included Tiros/NOAA and SMS/GOES. Beneficiary of many awards, he especially appreciated those connected with the major program he had managed for many years: *inter alia,* these included: Tiros Group Achievement Award (1966), Apollo Achievement Award (1969), NASA Exceptional Service Medal (1974), and National Press Club Award (1975). On several occasions throughout 1977 in the absence of the incumbent, he

had been designated Acting Deputy Director.

Certain there had been a mistake which could be rectified, and never considering age, he questioned the 1977 salary decision. His supervisor advised that "some committee" had set the pay raise, a fact confirmed by Keller, who suggested he write Dr. Naugle. A negative response resulted. Mr. Garbacz talked to Mr. Fong and joined him and Glahn in reviewing the problem with Dr. Fletcher. Subsequently, the Administrator advised that it was his prerogative to set the pay and he would accept the committee's recommendations.

It was Garbacz' position that he should have received $47,500 in February 1977, not $41,000, since his position was "well up in GS–16 equivalents", his job at NASA was very important, his performance was very good, and his colleagues, with similar responsibilities, were increased more than he in that pay raise.[17] He considered the assurance of NASA in 1974, when converted to the excepted position, as a contract tantamount to providing him the benefits (including salary) to which he would have been entitled had he remained a GS employee.[18] Later he would testify that had he received the $47,500 ceiling in February 1977, he would have been more favorably placed in the Senior Executive Service when it became effective.

Reflecting on other disturbing matters, he began to consider the adjustment a matter of discrimination. As example, in June 1977, when a 42-year old employee was selected for a NASA middle management

---

**16.** There is no question but that the pay structure at NASA produced odd results. As example, before the February 1977 adjustment, Bradford Johnson was Garbacz's "top" supervisor in Code E; he was receiving a salary less than Garbacz. "Under Johnson was Jaffe [Deputy Associate Administrator] who made the same as me and was higher in the chain of command in Code E." After the February adjustment Johnson and Jaffe received the maximum $47,500.

**17.** A mathematical compilation for all Headquarters excepted employees reflected that 60% received over $45,000 in February 1977; in October 1977 more than 78% received $45,000 or more. PX 1.

**18.** Three of our plaintiffs, Mr. Garbacz, Mr. Glahn and Mr. Lehmann, similarly situated, filed suit in the United States Court of Claims, claiming that the 1977 pay raises were a demotion, resulting from the 1974 involuntary conversion, an adverse action; that they had neither received required notice nor given their written consent to the change; and that the Administration was required to pay them the ceiling. Following this instant trial, counsel advised the Court of the decision in *Garbacz v. United States,* 656 F.2d 628, 228 Ct.Cl. 309, which rejected plaintiffs' arguments.

training course for which Garbacz had been one of three nominees, he attributed his non-selection to age discrimination. This was the only occasion during his years at NASA when he had been unsuccessful in securing the training he sought.

The February 1977 salary adjustment represented Mr. Garbacz' only salary dissatisfaction: in both October 1977 and October 1978 he received the maximum cost-of-living raises. Perceiving a limited future, he elected to exercise eligibility for early retirement in September 1979, at which time he was earning approximately $1,000 less than the ceiling. He continued to serve for ninety days more as a rehired annuitant.

Earl W. Glahn, employed at NASA Headquarters in February 1977 and holding an excepted position, was assigned to Code S as Program Manager, Flight Support. At 54 years of age, he was earning $39,600, a sum increased to $41,000 pursuant to the salary adjustments of February 1977.

A graduate of Oklahoma A & M University (B.S. in Electrical Engineering), Mr. Glahn pursued graduate study at the George Washington University. He had begun his professional career as a test engineer with private industry, entering government service (Navy Department) as an electrical systems engineer. At one point he was an electrical/electronics system engineer in the testing of the Polaris missile system. He joined NASA in 1961, as a GS–14, at the age of 38, and shortly thereafter became involved, at Headquarters, successively, as Program Manager, Launch Operations and Program Engineer for the (proposed) Voyager Program, each at the GS–15 level. In 1968, under the Director of Planetary Programs, he served as Program Manager, Mariner Mars '71, for the first orbital surveillance of the planet Mars, scheduled for 1971. His responsibility for the planning, direction, and coordination of the Program, with technical and management control, received acclaim in the form of appreciative letters (PX 67, PX 68, PX 69) and a $989 quality increase in 1972 for his "superior management abili-

ties" and "superior job in balancing NASA Program efforts, the Jet Propulsion Laboratory project office, and individual science investigators in the dissemination and utilization of the experimental results of the Mariner 9 Mission." PX 276. That year he was also awarded the NASA Exceptional Service medal for his outstanding leadership on this mission.

In 1972, at age 50, he became Program Manager, Flight Program Support, in the Office of Space Science, at Headquarters, in which capacity he served until the latter part of 1977.

As manager and under the Director of Planetary Program, Mr. Glahn planned, coordinated, and directed the design, development and integration of the space and equipment requirements needed for mission operations support for all planetary programs. The budget for his unit averaged 30 million dollars annually.

Prior to November 1974 he was serving with NASA in the grade of GS–16 in the competitive civil service and was notified that his executive-level position had been reviewed and was to be converted, as others, with no change in title or salary, to a NASA excepted position. In October 1975 and October 1976 his pay had been increased and those determinations provided salary equal to the GS employees' pay ceiling.

Prior to 1977, his performance had not been criticized and Mr. Glahn had had no indication that he was wanting in any respect. Since he had always received the anticipated pay increases, he was disappointed to learn of his salary adjustment to $41,000, an increase, but not the maximum possible. He felt he should be paid equally to others who apparently had equivalent responsibilities, duties and budget, and were close to his age, or even older: like the Director, Network Operations, age 52, and the Program Manager, Advanced Programs, aged 50, each increased from $39,600 to $46,300; or Manager, Deep Space, aged 56, Manager, Space Tracking, aged 55, and J. Holtz, Director, Explorers,

aged 51, each increased from $39,600 to $43,600. (PX 219.)

Due to his dissatisfaction with his salary adjustment, the sparsity of information concerning why that decision had been made, and his conclusion that age discrimination was involved, *see* PX 73, Mr. Glahn made it known that he was going to resign from NASA, a fact, he acknowledged, which could have supported his failure to receive the October, 1977 increase.

He was notified that his position was to be abolished in December, 1977 as the result of a pending reorganization within the Lunar and Planetary Programs Division and he would receive a reduction-in-force notice. He took early retirement.

Samuel H. Hubbard was assigned to NASA Headquarters, Code E, as Deputy Director of Communications Program. He held an excepted position and in February 1977 was 47 years old. His $39,600 salary was raised to $42,300 subsequent to the February 1977 salary adjustment.

A graduate of the Virginia Polytechnic Institute (B.S. in Aeronautical Engineering) and the Massachusetts Institute of Technology (M.S.), Mr. Hubbard entered government service in 1954 as a GS–7 flight test engineer. Thereafter, he became an aeronautical research engineer and, subsequently, as chief engineer and Deputy Director of the Observation Satellite Division of the Bureau of Navy Weapons, had responsibility for planning space system applications for naval operations. As a GS–15, he joined NASA at Headquarters in 1965, when he was appointed as special assistant to the Director of the Gemini Program, Office of Manned Space Flight, in a new excepted position. He was converted to the excepted service in 1967. Among succeeding positions, he served as technical assistant to the Associate Administrator for Applications for two years (1972–74).

At time of the pay adjustment in issue, Mr. Hubbard was Deputy Director/Acting Director of the Communications Program in the Office of Applications (Code E), a position to which he was assigned in 1974.

The objective of that program was to develop and demonstrate technology to increase the utility and lower the cost of communications services. Under Mr. Hubbard's direction, the Division operated five experimental spacecraft; developed high-risk communications technology and provided technical consultation on space communications matters to other government agencies and to private industry. The budget level of his program increased from over 13.0 million dollars in FY 1976 to 21.2 million dollars in FY 1978. At some point, 14 professionals and three clerical employees were under his supervision.

By 1977 there had been no specific performance evaluation, either verbal or written, during the 12 previous years Mr. Hubbard had worked for NASA. Still, there was a history of numerous pay increases, from $19,500 in 1965 to $39,600 in 1976, service in positions of increasing complexity and responsibility, and several commendations (group and individual) for his efforts and achievements. PX 75, PX 79, PX 81, PX 83, PX 85–89. In 1978, 15 months after the salary adjustment, he was highly recommended for the position of Technical Director, Communications, both by a past Director of that office under whom he had served as Deputy and by Bradford Johnson, the 1976–77 Associate Administrator, Applications.

Although he recognized the uncertainty of the potential increase, Mr. Hubbard had expected the increase in February 1977 to be much greater than it was. Were the adjustment predicated on his performance as Acting Director, he expected to receive $47,500 or, if based on his official position of Deputy Director, he anticipated an adjustment to $46,300. Instead, he was notified that his salary was increased to $42,-300.

While conceding that there may have been some judgmental errors in setting the pay adjustments for the excepted employees, the Associate Administrator assured Mr. Hubbard that the evaluations had been done with great care.

Mr. Hubbard examined his situation in respect to the rationale used in setting pay levels for excepted service personnel at the time the ceiling on federal employees was raised. The agency had stated that the pay level for each excepted position was measured by the employee's responsibilities, performance and contributions to NASA's objectives. He compared his own salary to those salaries received by Deputy Directors, Office of Space Flight (Code M); he considered that office organized along the same lines as his office. There, three deputies received $46,300; one received $47,500. In the Office of Applications, the salaries ranged from $41,000 (for two Deputy Directors) to $42,300 (Hubbard) to $47,500 (for one Director). Two of the four Division Directors, one 51 years old and the other 48 years old, received the maximum $47,500.

The dissatisfaction continued when Dr. Calio, who replaced Johnson, denied him the October 1977 cost-of-living increase without apparent justification. Hubbard contrasted his situation with Acting Deputy Director Goedeke (User Affairs): in February 1977 Hubbard (age 47) received $42,300 and Goedeke (age 42) received less ($41,000); in October 1977, Hubbard remained at $42,300, Goedeke received the full cost-of-living increase.

Convinced that he had made valuable contributions, utilizing initiative, competence and creativity, he could not understand why the pay setting had not benefited him more.

Dr. Calio arrived on board as Associate Administrator with a plan to reorganize and revitalize Code E, sweeping out key personnel, changing functions, and imprinting his management style. Recognizing his right to do so, Hubbard, nonetheless, questioned Calio's means to achieve the result. Mr. Hubbard's position as Deputy Director (as all other Deputy Director positions) was abolished as the result of reorganization in fall 1977. Told by Calio that he had a "magnificent" record during his 3½ years as Acting Director, he was nevertheless ineligible for the Director's position because the office required an electronics engineer at its helm and Hubbard was an aeronautical engineer. Eventually a 45-year old Director (two years younger than Hubbard) was selected at $47,500 salary. He was offered another job at the GS–15 level, as an electronics engineer. Preferring to retire, he rejected it, as he did a position offered him in Code T for which he was eligible.

When Mr. Hubbard left NASA, he took with him the conviction that there was an agency attempt to eliminate division managers over 45 years of age.

Fred D. Kochendorfer, 55 years of age and assigned to Code S as Program Manager, Pioneer, was employed at NASA Headquarters in February 1977, earning $37,800, an amount that did not change with the salary adjustment of that period.

With a degree in mechanical engineering from Stevens Institute of Technology, he commenced his government service in 1943 with the National Advisory Committee for Aeronautics, predecessor to NASA. Twenty years later he resigned to get industry experience, reentering NASA at Headquarters in 1970, as a 49-year old GS–16, with appointment as Program Manager, Pioneer/Helios Programs. Converted by NASA in 1974, when a GS–16/5, to the excepted personnel, he received an $1,800 administrative pay increase to $37,800 in October 1975. Under direction of the Director of Planetary Programs, in the Office of Space Science, Mr. Kochendorfer was responsible for the planning, monitoring and presentation to management of reports covering the Pioneer and Helios projects. By 1975, Pioneer G had been launched, Pioneers Jupiter 10 and 11 flybys had occurred (in 1973 and 1974) and Helios, a cooperative project with West Germany, in which Germany built the spacecraft and the United States provided technical assistance, was launched to investigate the properties and processes in the interplanetary medium close to the sun.

Mr. Kochendorfer received several kinds of commendation: letters of appreciation for his efforts with the successful pro-

grams, NASA's Exceptional Service Medal (1974) for his outstanding contributions to the Pioneer Program, and two quality increases (1971, 1972). In March 1976 his title was changed to Program Manager, Pioneer. Nominated for his Helios contribution by his Director for NASA's Outstanding Leadership Medal, he neither received that nor a pay increase in October 1976. Later he discussed his work with Dr. Calio who responded that the role of program managers in the pay structure was being reevaluated. When the salary adjustment of February, 1977 did not increase his pay he talked to the Director of the Lunar and Planetary Office. The inequity was apparent: Kochendorfer's Deputy, who held a GS–15/8 rating was earning $41,678 while Kochendorfer, in the excepted program, earned nearly $4,000 less ($37,800). He compared his lesser earnings to those both younger and older earning more in Code T; he considered them comparable in responsibilities and status: Bavely, at 52, earning $46,300; Herman, at 50, and Belcher, at 56, earning $46,300 and $43,600, respectively. The indication was that Kochendorfer should do something new. Accordingly, he applied in 1977, to no avail, for several program manager posts, including one (competitive) at the GS–15 level for which a younger individual was selected.

He joined in the class action EEO complaint stating his belief that age discrimination affected the recent salary increase.

In December 1977, with duties unchanged, the title changed again, to Program Manager, Pioneer Venus. Pioneer Venus Orbiter and the multiprobe launch occurred in 1978. The multiprobe mission ended in December 1978 when Orbiter and multiprobes arrived at Venus and probes impacted the surface. He applied for another program manager competitive GS–15 position in 1978 for which a younger, less experienced person was selected. He did, however, receive an administrative pay increase that year to $39,900.

In 1979 Mr. Kochendorfer was notified that his position did not qualify for the Senior Executive Service and that, in any event, the Pioneer Venus position was to be eliminated. The basic mission for Pioneer Venus Orbiter ended in August 1979. Mr. Kochendorfer was presented the sustained superior performance award and $550. The Planetary Division was reorganized. Mr. Kochendorfer moved in 1979 to the Code M organization and received a raise that year. At time of trial, he was an excepted personnel, Program Manager, Advanced Plans Office, Code M.

Jules Lehmann, age 61, was employed in February 1977 at NASA Headquarters holding an excepted position and assigned to Code E as Program Manager, Advanced Instrumentation and Sensor Engineering. Subsequent to the salary adjustment his salary of $39,600 was raised to $40,000.

Educated in France as an optical engineer, his master of science degree (equivalent) was followed by graduate studies and employment in the private sector in the United States. Among other business activities, he worked with RCA laboratories and managed the first meteorological satellite built by the Department of Defense utilizing RCA's capabilities. His background in optics and sensor systems engineering and management was invaluable in his direction of programs at NASA Headquarters, following his entry into government service in 1965, when he was 50 years old. Hired as Manager for Advanced Missions in the Meteorological Program Office, that office "disappeared" with a reorganization. He continued in the Office of Space Application in 1966 with the same title he held at trial. He initiated a new program, then called Advanced Application Flight Experiments (AAFE) which lasted over eight years until 1976 and which, over the years with 35 simultaneous applications experiments, provided technological and testing base for several major sensor systems, including some on the satellites SEASAT and Nimbus Seven.

Recommended for a sustained superior performance award in 1973 for his work of the previous 18 months, "his dynamic leadership, excellent technical background and

his thorough coordination" were hailed as the "keystones" in the continuing success of the AAFE program. PX 287.

In 1974 Mr. Lehmann was responsible for initiating an active microwave workship which examined microwave technology for applications and its potential from space. Between 1974–77 the budget responsibilities for his program had averaged 6.0 million dollars annually.

In 1974, when a GS–16/7, he was converted, at the same title and salary, to an excepted personnel. Rather than accept a GS–15 position, he acquiesced in the excepted assignment. Later, he would join suit with Michael Garbacz and Earl Glahn, protesting the involuntary conversion and what he found to be the adverse effect of its salary.

He had not received any indication that his performance was deficient, expected the maximum raise in 1977, and was, therefore, "flabbergasted" when his pay was increased so nominally.

He searched for a rational explanation, eliminating other possibilities; he concluded that age discrimination was the reason for the small increase and for his non-selection for a training course (where insufficient resources was the justification given).

In part, Mr. Lehmann attributed his failure to receive a raise to the demise of his AAFE program which had been cancelled and was not in existence at time of the salary adjustments. That program ended following the arrival of a new Associate Administrator, Bradford Johnson. According to Lehman, Johnson was convinced that this was such a good program it would not be curtailed despite its sizeable budget. He was wrong; it was terminated along with other Directors' programs, by NASA Headquarters' decision, which required across the board slashes to meet appropriations. Had that very successful program continued, Mr. Lehmann was convinced his pay would have been substantially increased.

In October 1977, he was again dismayed with the lack of a salary increase. Dr. Calio told him his performance had eroded but that he would reserve judgment and, with improved performance, Lehmann would be given an increase. Thereafter, Lehmann did satisfy Calio's requirements and became a member of the Senior Executive Service. In October, 1978 he was increased to $42,400; in December 1978 he was increased to $44,756; and in October 1979, he was earning $47,889.

In February 1977, Jerome D. Rosenberg was 56 years of age, employed at NASA Headquarters, holding an excepted position and assigned to Code E as Director of Technology Applications Program. His salary was $39,600. Subsequent to the salary adjustment of February 1977 it was increased to $42,300.

Educated at the City College of the City of New York from which he received a B.S. in physics, he did professional studies at other universities. His initial 13 years of government service were performed at the Diamond Ordnance Fuze Laboratories as supervisory electronic scientist and supervisory research physicist. As a GS–15, at age 41, in 1962, he commenced his work at NASA Headquarters, in its Office of Technology Utilization. From 1964–69 he occupied dual positions as Program Manager, National Geodetic Satellite Program and Project Manager, Geodetic Explorer, Office of Space Science and Applications. During this period (in 1967) he had been converted to an excepted employee.

The next five years Mr. Rosenberg served as Deputy Director of Communications Program, Office of Applications, where he was involved in the research and development of two flight missions in advanced communications technology.

At time of the February 1977 salary adjustment he had been Director of Technology Applications Program for three years, since age 54; his division, with a 2.1 million dollar budget, was responsible for all NASA's work in converting NASA technological systems experience into systems that met civilian needs. Although very small and a "one-man" operation, his program was very successful, serving an im-

portant function in its adaptation of the benefits of space to other than space needs. As example, the division developed a system which converted sludge into activated carbon and then used it to treat wastewater.

The recipient of honors and awards, he received a quality increase in 1966 (recommended by Marcel J. Aucremanne, his then supervisor), commendations for his work on panels and committees, NASA's Exceptional Service Medal (1973),[19] and plaudits for his work at the Department of Energy.

Prior to February 1977 he had neither been denied a pay increase nor received one less than he deserved. Dissatisfied with the 1977 salary adjustment, he had expected to receive the $47,500 ceiling as did two other directors in his office. Like the other plaintiffs he did not accept the explanation that this was the considered decision of a committee.

Suggesting that NASA had a commitment towards young talent, disfavoring the more mature professional, at least in monetary recognition, Mr. Rosenberg declared that "they followed the age line in a sense with some exceptions" in Codes E and S, the increases ranging across the spectrum from zero to the ceiling.

During his evaluation of the impact of age on salary increases, Mr. Rosenberg developed analyses to determine the age distribution of salaries and salary adjustments for NASA Headquarters Excepted Employees before and after the February 1977 adjustment. Three different groups were examined: (1) nonengineering/science personnel in codes other than the five involved herein; (2) engineering/science personnel in Codes R, T and M; and (3) engineering/science personnel in Codes S and E. He concluded that each group reflected salary adjustment increased at the lower age brackets (36–43) and that, unlike groups 1 and 2, the salary adjustment resulted in a substantial decrease in salary levels for the higher age brackets in Codes

E and S (which include the plaintiffs in this case). PX 18. Nonetheless, he could not reconcile why science personnel in Codes R, T and M fared well at the higher age levels, and had to concede that the other offices (codes) "did not conform", citing Code R "where they didn't care about their age" and all division directors were increased to the maximum $47,500.

Mr. Rosenberg also questioned the change in practice. When he was made an excepted personnel in 1967, despite the smallness of his office (staff and budget), the individual was the important factor. Yet, he suspected (erroneously) that the review committee had rated the position, not the individual, as the most important determinant of salary. Under this approach his $42,300 adjustment would have been based on the size of his division (small), clearly not as valuable as a division with hundreds of million dollars programs whose leader would, under this view, be entitled to the $47,500 ceiling.

In June 1977 Mr. Rosenberg left the Office of Space Applications. In October he received a $2,000 increase. He became Special Assistant to the Director, Energy Systems Division and then was temporarily assigned, for one year, to the Department of Energy. By October 1978 he was earning $47,500. He retired from the federal service in June 1979.

Edwin R. Schmerling, 47 years old and earning $39,600, was employed at NASA Headquarters, holding an excepted position and assigned to Code S as Program Chief, Space Plasma Physics, Solar Terrestrial Division. After the salary adjustment of February 1977 his salary was increased to $41,000.

His undergraduate and graduate degrees, including the Ph.D. in physics, were conferred by Cambridge University, England. After teaching electrical engineering at Pennsylvania State University for seven years, he took one year's absence from the

---

**19.** There were at this time 35–40 such medals presented annually, selected from NASA's 24,-000 personnel; approximately 1,600 personnel were at Headquarters during the relevant period.

academic life and spent that time, at 33 years of age, at NASA Headquarters as a staff scientist (excepted personnel) running the Ionospheric Physics Program. Dr. Schmerling then returned to the University. In 1964 he rejoined NASA in the excepted program as Program Chief for Ionospheric Physics. Six years later he became Program Chief, Magnetospheric Physics, with enlarged responsibilities. Those early years at NASA were "great", burning with the spirit that leadership and accomplishment would co-exist in this new agency: "You could be a doer rather than a writer." The excitement was enveloping and contagious; the scientists would identify what had to be done, persuade people to invest their time and resources in the project and accomplish the task. As a result of his education and experience, including cooperative association with the scientific community in other countries, he was appointed International Coordinator for the Office of Space Science, working with France, Germany and Japan. In 1976, when 47, his title was changed to Program Chief of Space Plasma Physics as the result of one of numerous on-going reorganizations. Dr. Schmerling described his responsibilities:

> In the Office of Space Science, through the Division Director (currently Solar Terrestrial Division) for the scientific planning, direction and management of research of those regions in space where plasmas play a significant role. This starts in the upper atmosphere (around 50 miles) and extends outwards through interplanetary space to planetary environments—but the main emphasis has been on the earth's near-space environment. We work with NASA Field Centers, other government agencies, Universities, Industry and scientists in other countries.
>
> Main program scientist responsibilities for spacecraft programs: Alouette I, Alouette II, ISIS–I and ISIS–II (cooperatively with Canada); FR1 (cooperatively with France); Ariel (cooperatively with United Kingdom); San Marco C, D (cooperatively with Italy); Aeros (cooperatively with Germany); IMP–G, H, I; Atmosphere Explorers C, D, E; International Sun-Earth Explorers (ISEE) ISEE–A, B, C (cooperatively with European Space Agency); Atmospheres, Magnetospheres and Plasmas-in-Space (AMPS) Spacelab (Space Shuttle) program; also responsibilities for portions of others, and Supporting Research, Data Analysis and Sounding Rocket program in Space Plasma Physics.

Among the many honors acknowledging his achievements, Dr. Schmerling highlighted his election as a Fellow in the Institute of Electrical and Electronics Engineers (1971), the Group Achievement Award (1972) for contribution to the overall success of the International Satellite for Ionospheric Studies Project, his 1978–81 appointment as a U.S. member of the Electromagnetic Wave Propagation Panel of AGARD, of NATO, representing NASA, and the NASA Exceptional Service Medal in 1979 for his participation in the International Sun-Earth Explorer (ISEE) program. Letters of commendation attest to his contributions to the Physics and Astronomy Programs and his participation and chairmanship of workshops/meetings. *See* PX 124, 126, 129.

Prior to 1977 there was no indication that his performance at NASA was less than satisfactory or that his position was less important than other positions with similar title. He considered his work as an "important area of scientific research", exemplified by the annual 30.0 to 40.0 million dollars budget allocated to his programs. His salary history reflected a constant rise from 1964 ($21,500) to October 1976. He had never been denied a pay increase.

The adjustment in salary in February 1977, although an increase to $41,000, was, nonetheless, modest, unexpected and disappointing. He had anticipated receiving the maximum, or $43,500 at the very least, the level of a colleague. In a situation similar to the other plaintiffs, the salary decision-makers had not consulted with his supervisor. He explored the matter with Dr. Hinners who confirmed that his technical com-

petence was unquestioned, but suggested that Schmerling "push[ed] too hard." He could not understand why a colleague two years younger and also a program chief, had received a greater increase than he.

He considered the matter one of age discrimination "having exhausted my ability to find any other explanation. I was suddenly confronted with a pattern respecting age and my knowledge of how Codes E and S were treated. To this day I have not received any other explanation."

Dr. Schmerling opined that NASA was becoming "preoccupied" with age, citing "Age Dynamic Statistics", a 1978 age analysis report undertaken to provide data to the Personnel Management Review Committee. This study considered historical data for the entire NASA population for the five-year period (1973–77), accessions, promotions, quality increases, honor awards, downgrades, separations and executive compensation. It reflected that promotion rates in 1977 for NASA scientists and engineers, GS–14 and 15, were: 30–39 age group (17); 40–49 age group (36); 50–69 age group (11), PX 216, Figure 2D. It further indicated that NASA provided honor awards for excellence and substantially more awards were granted to the over 40 age group than to those under 40. *See* Figure 5A, PX 216.

According to Dr. Schmerling's independent calculations, salary rose with increasing age, but peaked at 43. While Codes R, T and M gave increases greater than Codes E and S, the rate of increase tended to decline with age; a greater tendency existed in Code E, and Code S reflected the largest salary reduction of all as age increased. He concluded, therefore, that although all excepted employees at Headquarters suffered a small diminution of salary with increased age, ("there is a small but significant reduction in salaries as the ages increase") the plaintiffs suffered the most, with their salaries well below average. In February 1977 the plaintiffs' spread of increases, of a possible 20%, ranged from 0 to 11.9%.

His analysis of the agency data relating to pay schedules, secured through a request under the Freedom of Information Act, concluded that "of all E & S excepted employees not already at the ceiling the only raises went to two, age 36 and age 40. Seven others, all 45 or above, got no raise." PX 112.

Until 1977 Dr. Schmerling did not dwell on discrimination. After the failure to receive the anticipated raise, he recalled that in 1976, for the first time, an application to attend a conference was denied on the excuse that priority was given to the newer arrivals; they also were younger. Similarly, in view of the workload and cost, he was denied a request to attend a 2-day professional program for graduates of the Federal Executive Institute. He had attended the latter, more intensive course for several weeks in 1975.

In October 1977, Dr. Schmerling's salary was increased to $42,500; in October 1978 to $44,850; he entered the Senior Executive Service and in July 1979 was raised to $46,470. In early 1980 he was receiving $49,499 and was at level 2 of SES; in his opinion, he should have been at level 4, and would have been, had he achieved a higher increase in 1977.

Although the plaintiffs finally viewed the salary adjustment as the result of age discrimination, they had first considered the possibility of other forms of discrimination: initially, they considered sex (male); then religion and anti-Semitism. They decided to focus on age discrimination as "the only thing feasible for all this happening."

They looked upon NASA as "youth-oriented" and discriminatorily "preoccupied" with age with its concern that top personnel—the experts—would, as Rosenberg expressed it, "all become 65 at once, all will retire at once and the leadership will be lost." Born in 1958 in advancement of the nation's space adventure, NASA was younger than most other agencies. The burst of Sputnik had brought space exploration to the United States, and with it, recruitment of the young. NASA had to fill its ranks with young people when it

organized because there was no one else with the experience in space. As Mr. Rosenberg recalled: "Space was a new thing, there were only young people in there; they didn't find anyone else except for Werner Von Braun."

They gave some examples of their concern. A 37-page Report of the National Research Council, contracted by NASA and the National Academy of Sciences, addressed the potential role of the NASA's Lewis Research Center in the requirements for supporting research to facilitate the creation of advanced aircraft engines.[20]

Plaintiffs focused on some of the content as illustrative of NASA's interest in age, PX 231:

Adequately trained and talented technical manpower is an essential element to the success of any research program. Because of the diversion of personnel to various space programs, and the aging and recent attrition of top level managers at Lewis, the laboratory should institute a personnel revitalization program that calls for new hiring, internal training programs, and increased interaction with universities. [At p. 1.]

... it has been only in the last ten years that Lewis has been reactivating its talent for air-breathing engine research and attempting to recruit young people into the field. Some TETF members felt that this situation was responsible for inconsistent progress in turbine component development. Lewis' management believes that it will still take several years to fill out the technologies needed and complete the modernization of the Center's functions (including the acquisition and assimilation of younger engineers to replace many who are reaching retirement age). [At p. 5.]

Any assignment to NASA centers of major mission responsibilities for energy needs to be accompanied by an appropriate increase of manpower ceilings to help NASA do the required tasks and to recruit and train younger technologists to replace reassigned or retired NASA personnel. [At p. 20.]

If its mission were expanded, Lewis' effective ongoing relationship with universities and the technical community are likely to contribute to the acquisition of young technical employees. Such relationships should be nurtured and expanded ... [At p. 28.]

One year after the salary adjustment that highlighted the issue for these plaintiffs, the Administrator made remarks considered by the plaintiffs evidence of age discrimination—

... we are facing the possibility in a few years ... of a large number of people retiring and we're facing at the other end of it because we have not been hiring any new personnel ... we have not done very well in bringing in their replacements ... in bringing in the young people and establishing a kind of ... stable population in the agency. ... I would hope we would be able to accomplish over the next couple of years if we can figure out ... how to do it properly is to be in a position ... to begin to ... recruit some young people so that we can establish a better balance in the future. ... Part of the difficulty is that the agency even though its now 20 years old it is sufficiently young that it has never really come into an equilibrium in which there are people coming in and growing up with the agency and going out. ... it essentially was established once or ... and a relatively short time ... has tended ... to have a ... a large body of people who are doing its job and doing it very well but not having room to replenish it out of that growth. That's the

**20.** The Committee members responsible for the Report were comprised of active and retired persons of the Aeronautics and Space Engineering Board, Assembly of Engineering, from Lockheed Corporation, General Motors Company, Chrysler Corporation, Pratt and Whitney Aircraft Division, Boeing Company, General Electric Company, General Dynamics Corporation, Massachusetts Institute of Technology, Purdue University, Energy Research and Development Administration, United States Air Force Arnold Engineering Development Center and one representative from Lewis Research Center (NASA).

central problem for us because its the problem of finding a way for the agency to ... to be stable at whatever size its going to be ... for a long period of time. We never really quite established that. [PX 234].

NASA vehemently denied discriminating acts or intentional discrimination towards any of the plaintiffs. It explained the process through which its officials concluded the alignment and distribution of the salary and the exercise of its business judgment towards each plaintiff.

In anticipation of a probable increase in the statutory ceiling for GS–18s, a new excepted position salary plan was devised which combined features of the GS supergrade system with the NASA requirement for full flexibility in dealing with salaries of its excepteds to decide to grant or withhold rate increases based on the accomplishments of the individual involved. In this structured way, NASA could reestablish the relative status of its excepted employees, at this time a number less than the authorized 425.

To understand the defendant's position, it is necessary to consider recent salary history and how NASA projected the anticipated adjustments. The ceiling for excepted employees had been established at $36,000 in 1970. Approximately 5% of the excepteds were at the maximum; the remainder were structured down in graduated steps. Between the establishment of the $36,000 ceiling and its increase to $37,800, in November 1975, and as the lower graded employees rose in salary by automatic increases, the excepted employees who should have been at the ceiling were compressed down to salaries comparable to other excepted employees, eliminating the separation between the various level excepted employees. When the $37,800 level was raised to $39,600, in October 1976, almost all employees were raised to that level; therefore, all were compressed at the same level at the time the $47,500 ceiling was anticipated. With the first major raise in seven years it had finally become possible, in the unusual circumstances of this very sizeable (20%) increase, to re-establish relative ranking of these excepted employees on a graduated salary scale.

Chaired by Samuel Keller, (Assistant Administrator of Personnel Programs), a committee of eight was appointed, four persons each from staff and line offices. All excepted positions in the agency had to be reviewed, categorized, analyzed, and assessed for the purpose of presentation to the Administrator, the final decision-maker. The team met on numerous occasions, devoting substantial effort to the task. It's objectives included "build[ing] a spread", based on position and merit, through the expecteds' general pay levels, to avoid compression problems where everyone, regardless of merit and responsibility, would receive the same pay. There was no requirement, though, that any certain number of personnel had to be at a certain pay level.

The review team worked with the supervisors to develop information and recommendations for a pay distribution to the Headquarters employees. To avoid premature concern it was decided to not directly interact with the first line supervisor of the expecteds under review. Many elements were evaluated in the process. Basic criteria, looking both to immediate past and immediate future were: the position, the level of difficulty and responsibility it presented and the execution of that responsibility by the employee; the individual's performance and his responsiveness to the difficulty of the position; and technical and/or administrative contribution both to the agency and to the office program.

Initially, the line supervisor would place the employee into a level (A–E) within the guidelines. There was absorption of different position contributions required at different levels, which had to be competitive with other government agencies. It was recognized that a division director in one code would not necessarily equate to a division director in another code because of sizeable fluctuations in position responsibilities. There was, therefore, evaluation of the level of difficulty of the position relative to the complexity of the programs of

other program managers in other codes. The mechanical (non-judgmental) rate was developed by the personnel office reconstructing the pay history of each individual by reference to personnel files.

Performance was defined in terms of current competence, the exercise of the individual's capability, timeliness, and the ability to interface/communicate, with good rapport and sensitivity, with the agency, with its consumers, the Office of Management and Budget (OMB) and Congress. The respect given to that individual by the scientific community was also considered.[21] An element in the performance rating concerned the level and quality of responsibility required by the position's complexity and the responsiveness of the employee to that delegation/requirement of duties. Was his performance at, below or above the established level of the position, justifying thereby a constant or higher or lower rate? If he were operating independently, with responsibilities more significant than others, albeit in the same type of position, the good performance of greater responsibilities would suggest a higher rating and appropriate salary increase. Was he a full circle communicator giving, exchanging and translating materials from Headquarters to the field, from the field to Headquarters, among other repositories of information? Despite resulting salary disparities, attempts had been made to effect equity across the code lines. Nonetheless, it was unquestioned that some programs were greater in magnitude and technical responsibility than others. As example, the Office of Space Flight, Code M, responsible for Shuttle development, had an annual 1.7 billion dollars budget, of a total 15.0

billion dollars cost. Its personnel in this major NASA activity were consciously placed at higher levels than individuals in the other offices. The Office of Tracking and Data Acquisition, Code T, which ran two worldwide tracking efforts, was organized differently from other Headquarters program offices with a small Headquarters structure of 30–35 people and many functions in the field center. Its budget for FY 77 was 255.0 million dollars. The average salaries here would be relatively high. The Office of Aeronautics and Space Technology (Code R), with a budget of 263.0 million dollars, had not been represented on the committee. As Keller testified, its personnel fared better in comparison to others, due to the review team's lack of information about them and the value of their positions. In contrast, Code E had a budget of 195.0 million dollars and Code S, a 378.0 million dollars budget. Although E and S were no less important than other offices, the responsibilities of some of the positions there weighted less than the responsibilities of positions in some other codes.

After the process was established, the Associate Administrator for each of the program offices, Codes S, E, T, R and M, would present his assessments to the review team for each of the excepted personnel in his particular office.[22] The information was assimilated and the inputs evaluated, analyzed and debated among the review team members and with the Associate Administrator for each code. In effect, the review team evaluated each Associate Administrator's assessment. The team would meet together to look for parity and con-

---

21. Dr. Hinners (the Associate Administrator for Space Science, Code S, 1974–79) and Dr. Calio, his deputy, defined the criteria differently, but their views were similarly founded. As example, Dr. Hinners testified the evaluation was based solely on performance but his broad concept of "performance" encapsuled the multiple criteria expressed by Dr. Calio. Dr. Hinners looked beyond parameters of position descriptions: demonstrated initiative over and above job requirements produced a "high plus factor" in the assignment; his evaluation represented this view.

22. For each excepted individual, including each of the plaintiffs, there was a tabulation and affixing of a mechanical rate (a letter and numerical matrix), the office recommendation (full performance level and how the incumbent rated within that level), and the committee (review team) recommendation of full performance level and the incumbent's rating within that level. *See* DX A.

sensus for presentation of the team recommendation to the next level of review.

Code S was represented by Dr. Calio, one of the team's members, who served officially as Deputy Associate Administrator for Code S under Dr. Hinners. That Associate Administrator and his deputy met frequently to discuss their evaluation of the 24/25 excepteds in Space Science. Although Dr. Hinners presented the office's recommendations, Dr. Calio's influence was evident. As Hinners testified: "Evaluation of capabilities is a continual exploration."[23] Discussing the general consideration given to the "criticality" of schedules and the quality of documents (with narrative descriptions and supporting documentation for OMB and Congress), Calio explained the relationship of the incumbent's program and his performance within it. The distinct parts of a program, in his view, were: (1) the initiation phase, with planning and formulation; (2) the "actual defense, putting it all together and getting it started"; (3) the implementation phase where the project manager makes the day-to-day decisions and the program manager provides oversight; and (4) a data analysis and recording stage. With this structure in mind, we sum this Associate Administrator's assessment of each plaintiff.[24]

Mr. Aucremanne, at D/5, was tabulated at mid-range. His performance was not at full peak. The Space Telescope Program, an important project, had been in the planning and formulation stage from four to five years and was only approaching its second phase, where the highest level of responsibility could be demonstrated. Timeliness here was particularly important since the agency was in the process of formulating and defending its budget. Although Aucremanne was good in transferring information to the field, he was deficient in the full interface of evaluating and assessing the information coming from the field center and conveying that to Headquarters.

Dr. Brunk, tabulated at D/5, was a planetary astronomer of outstanding and unquestioned competence. There was no concern about his performance in that program. His performance, however, was deficient in the IRTF to be located in Hawaii. Although admittedly a very difficult task, both in definition and implementation, serious difficulties were associated with development of this project. It was critical to the credibility of the agency that it be timely implemented and at cost. It was implemented one year later, at an additional cost of 3.4 million dollars. Dr. Calio had been dispatched by the Administrator "to pick up Brunk's responsibility and put the program back on the right tract." Dr. Brunk and Dr. Calio had "different styles of doing things"; on occasion, a "personality conflict" existed between them. As a scientist (not an engineer), Dr. Brunk should not have been assigned to oversight of this construction job. Although he was not solely responsible for what occurred (since the facilities were no longer under his charge), Hinners remained displeased, even angry, with Brunk's IRTF performance; he "should have managed better" and should have "definitized sufficiently the specifications and implementation of the telescope and its use by the Hawaiian scientific staff." In substantial part, Dr. Hinners relied on Dr. Calio's judgment for this assessment, even though he recognized that Dr. Brunk "got caught in the circumstances."

---

**23.** The Associate Administrator (AA) demanded a certain level of performance, expressing his pleasure or displeasure through his style of management: he would work with his deputy to whom he delegated the personnel problems, and with the division directors. The division directors would work directly with the program managers. The program manager would be present for discussion with the AA only through monthly program reviews, if his special project was then on the agenda.

**24.** Dr. Hinners clarified to the Review Committee his selection of a certain level for a particular individual; he would explain how that performance compared to others who rated higher or lower, attempting, in a comparative sense, to evaluate one program manager with another program manager of similar discipline, that is, one scientist to another scientist.

Mr. Glahn rated very highly with a D/9 out of a maximum D/10. He had full capability but was not giving the fullest performance at his command. Although he provided good contributions and always did the job asked to do, he did no more; he was capable of greater initiative and contribution to the agency.

Mr. Kochendorfer also received a D/5, mid-level rating, attributed by Hinners and Calio to the deficiencies his project, Pioneer Venus, was undergoing at the time in scheduling, cost maintenance, and technical programs at field center. While a program manager could not control exact numbers, he could control cost escalation by a course of action more pronounced than Kochendorfer demonstrated. Dr. Hinners was required to become directly involved to bring this project within cost/schedule; he blamed Kochendorfer for the result.

Dr. Schmerling received the top mechanical rate affixed to his position, although he could have been placed higher. Unquestionably an excellent physicist, he was an "overzealous" supporter of his individualistic philosophies as to program content, "pushed" his ideas after decisions had been made and was, in short, "not a team player." It was otherwise recognized that Dr. Schmerling was energetic, took pride in his accomplishments and "kept his scientific community happy."

Dr. Hinners and Calio were adamant that age was neither considered nor discussed as a factor in the review committee or in the assessment discussions. No evidence disputes these statements.

Explicit in his views on career longevity, Dr. Hinners noted his encouragement to others, by his personal example, to abbreviate careers at NASA Headquarters (no longer than five years), a move consonant with his belief that to remain too long in any one place, and particularly at Headquarters, resulted in staleness, boredom, and removal from the day-to-day activity and sensitivity in the "real world" beyond. Without rotation, he espoused, alertness diminished and bias increased. It was also essential to introduce to NASA the thinking from industry, from the university, from other scientific communities through new personnel: "Experience is worth a lot but you get bored doing the same thing; people [referring to the incumbents] are kept alert with new challenges; often they wake up and respond to this."

Bradford Johnson, Associate Administrator for Applications, Code E, from June 1976 to October 1977, was involved with the salary adjustments made by the Administrator in February 1977, including excepteds in his Code. His field was management; he had no training in science or technology. His objective: encourage people to do their work, requiring them to accept responsibility for their actions.[25] As he assessed each excepted employee, he considered the responsibilities of the position, performance of the individual within those responsibilities and contribution, both to NASA as a whole and to the mission of Code E. He did not consider Code E any less, or more, important than Codes M, R and T but recognized that its funding was less than some other codes. He believed he was achieving "some degree of quality, parity and justice", attempting to make his recommendations "internally consistent" in comparison to the other codes in NASA. Impatient with any result less than his expectation,[26] Mr. Johnson was unusually brusque in his attitude, intolerant of normal imperfections and uniquely insensitive to the dedication of some of the plaintiffs under his supervision. Although occasionally disputing his evaluations, he relied

---

25. Dr. Calio had contrasted his very different management style with his predecessors: Bradford Johnson was "overly-people oriented" and had much delegation; Charles Matthews, a dedicated engineer, was very product oriented. Dr. Calio considered himself more production oriented than Johnson—"I think of production before people ... I do delegate authority but I do not completely delegate responsibility ... I think the manager has to be familiar with the subject matter."

26. It should be noted that Mr. Johnson was harshly critical of self-activities, casually defaming his own performance.

heavily on the judgment of his Deputy, Leonard Jaffe, to whom he delegated personnel decisions. As a member of the review team, Mr. Jaffee participated in its meetings and determinations concerning the pay structure of all NASA excepted personnel. Although he concurred with many evaluations of position responsibility, he was more generous than Johnson in his assessment of the plaintiffs and would have rated and raised several of them higher than Johnson. As Jaffe said: "It's just that I would have rated them differently ... it's a matter of judgment and not necessarily wrong."

Associate Administrator Johnson made the final office recommendation for all 16 Code E excepted personnel, Deputy Jaffe presented them to the review committee and Johnson defended the position before the senior review group. Distilled to essence, his attitudinal reflections on his employees follow.

Mr. Fong was evaluated at D/7 instead of the maximum D/10 because of the "unimportance" of his job. Although there were no complaints about Fong's performance, Johnson, with remarkable disdain, testified that he perceived Fong's contribution as "minimal" and saw him as "totally replaceable and not worth my time to cope with it" although "I probably intended to give him a slight raise." Jaffe would have ranked Fong higher, as a D/9, although he agreed with Johnson on the lesser responsibility of Fong's position.

Mr. Garbacz, who performed his important job well, was evaluated at C/2 rather than the maximum C/8. Mr. Johnson did not work directly with Mr. Garbacz and recalled that his judgment was based on others, including Jaffe. Yet Jaffe would have positioned Garbacz two levels higher.

Samuel Hubbard was assessed at the C/3 level; he did not achieve the maximum C/7. Although Mr. Hubbard "did a good job in the end on search and answer, it took time and effort to get it done", to the exclusion of virtually everything else, and Hubbard should have had answers at his immediate summons.

Jules Lehmann received a D/7 evaluation. Mr. Johnson had approved his division director's elimination of Lehmann's AFTE sensor-testing program "since it coincided with my evaluation of Lehmann's performance." Deputy Jaffe concurred with the D/7 evaluation but considered Mr. Lehmann an expert on instrumentation, particularly imagery: "We looked to him on behalf of the whole office."

Mr. Rosenberg received a C/3 evaluation. His position was described by Johnson as a "not very important job in terms of Code E and NASA." Although he did a "workmanlike job", he was not "dazzling". Mr. Goedecke, with whom he compared Rosenberg, was "more qualified, innovative, trained, articulate" than Rosenberg. Jaffe would have rated Rosenberg considerably higher, at C/6.

Later, in October, 1977, after consultation with Calio and Jaffe, in particular, Johnson made further recommendations about salary adjustments. Mr. Fong, Mr. Hubbard and Mr. Lehmann were not recommended for increases. Mr. Garbacz, "a good man doing a good job", was recommended for a 7.5% increase. By this time Rosenberg had transferred out of Johnson's jurisdiction.

Despite Mr. Johnson's unusual attitude towards his employees, there is no evidence that age was ever considered in the decisional process.

The office recommendation and committee recommendation were the same for each of the ten plaintiffs, a not surprising situation since substantial discussion had occurred prior to the consensus reached. Series of recommendations were established for each personnel and presented to the Senior Management Group [27] reflecting the proposed level and specific salary for each excepted. These were reviewed in

27. This Group was comprised of the Deputy Administrator, the Associate Administrator, the Associate Administrator for Center Operations and the Associate Administrator for Manned Space Flight.

free-flow discussions with the Senior Management Group as it conducted its own review, discussing, analyzing and adopting a result for each excepted personnel, cycling its initial conclusions back through the line supervisor. The Senior Management Group accepted the review team's evaluation of comparisons between the offices. Of the plaintiffs, only Dr. Fong received a higher level at the senior review which, during the course of that discussion, and with the gathering of additional information, reverted to the earlier (lower) level of recommendation.

That Group made the presentation to the Administrator who established the salaries. He, too, had concern for Fong's positioning in the salary structure because of his additional EEO duties. Accordingly, he sought and received further evidence of Fong's contributions but did not subsequently alter the original placement of Fong in the position/salary structure. The Administrator did, however, raise Mr. Lehmann to $40,000, $400.00 more than the recommendation.[28]

With one exception, age was never discussed during the process, the singular reference questioning whether Dr. Calio was too *young* for his position.

These evaluations of ten dedicated NASA employees were dramatic, sweeping, caustic and understandably devastating to the recipients. Harsh as they were in application and result, they cannot fairly be attributed to age discrimination. While it is easy to disagree with the collective business judgment towards each plaintiff, those judgments were reached through formulated criteria, layers of review and free discussion. There is no doubt that the views of the Associate Administrators and their deputies were significant. There is little doubt that it would have made sense, and been a wiser business decision, to have also received the full imput from the first-line supervisors. But, however the matter might have been better approached, the failure to receive salary increases commensurate with plaintiffs' merit and expectations cannot be laid at the door of discrimination.

Consider also what occurred subsequently in the months and years beyond early 1977. Several plaintiffs who remained in the agency, as excepted personnel or in the SES, gained steady salary increases: Dr. Brunk promptly received the full comparability increases; Mr. Kochendorfer moved to Code M and was raised in pay; in three years of steady advancement, Dr. Schmerling was earning $8,500 more; Mr. Fong increased more slowly but did receive increases and higher evaluations from Dr. Calio for his "unimpeachable scientific/technical credentials." We cannot predict what would have happened had Mr. Aucremanne not left to take a GS position or Mr. Glahn not retired or Dr. Rosenberg not decided to remain with the Department of Energy.

It is unquestioned that in terms of its entire workforce (excepted personnel and General Schedule personnel alike) NASA was concerned about the number of increasing retirements. This agency, born less than nineteen years prior to the salary dispute, and young among other agencies, had an unusual age distribution. Its early years' employees—the founding personnel—in effect—had come to the agency over a decade and were essentially within a 15 years' age parameter. Our plaintiffs typify the problem: nine of the ten plaintiffs arrived at NASA during a 7-year period (1958–65); one arrived in 1970. There is an 18-year spread in age at time of initial employment at NASA (ages 32 to 50). Many of plaintiffs (aged 47 to 62) would be eligible for retirement in 8, 15, 20 years (some earlier) and the stabilization of the NASA population was in doubt. For the agency to survive, as any organization in governmental or private industry, the young had to be recruited, trained, involved, prepared for the long future.

---

**28.** With his final decisions, the Administrator changed 5–25 recommendations of the review team concerning all excepted personnel.

A matter in point: the plaintiffs proffered NASA's contracted study to support its focus on age as evidence of discrimination. NASA viewed its comments as reflective of its intention to rely on the "mature professional" for establishing new programs and directing old ones, all the while hiring and training the young.

> *NASA should not reduce the number of employees....* In fact, manpower ceilings will need to be raised if important energy roles are accepted. This does not mean that talent should not be shifted. To the contrary, *mature professionals should be utilized in establishing new programs* in energy, while young development technologists and research people should be brought into NASA to participate in energy research as well as in the aeronautical field. A new mission assignment should give Lewis an excellent opportunity to *acquire able young researchers and train them in programs directed by more experienced practitioners.* [PX 231 at 21, emphasis added.]

The plaintiffs viewed this philosophy as a ball-bearing in the wheel of age discrimination. NASA viewed it as a pragmatic business concern. So often sensitivities skew perception, and insensitivities stimulate litigation.

■ The evidentiary guidelines governing allocation of proof in age discrimination cases under the ADEA are identical to those developed in Title VII litigation. *See Krodel v. Young,* 748 F.2d 701 (D.C.Cir. 1984); *Coburn v. Pan American World Airways, Inc.,* 711 F.2d 339, 342–43 (D.C. Cir.), *cert. denied,* 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed.2d 683 (1983). According to that scheme articulated in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981):

> ... an individual plaintiff claiming disparate treatment must first make out a *prima facie* case—*i.e.,* must demonstrate sufficient facts to create a reasonable inference that race, sex or age was a factor in the employment decision at issue. Once a *prima facie* case has been established, the employer bears a minimal burden of 'producing evidence' tending to show that the plaintiff was denied employment or promotion for a legitimate nondiscriminatory reason. If the employer does so—and if his evidence is credible—the plaintiff must show by a preponderance of the evidence that the employer's asserted legitimate reason is a 'pretext' for discrimination.... In disparate treatment cases 'the ultimate burden of persuading the trier of fact that the defendant discriminated against the plaintiff remains at all times with the plaintiff.'

*Krodel* 748 F.2d at 705–06. Underlying this approach to an ADEA claim is the ultimate question of the case: whether age was *a determining factor* in the disputed employment decision. *Cuddy v. Carmen, ("Cuddy II"),* 762 F.2d 119 (D.C.Cir.1985); *Krodel,* 748 F.2d at 706.

■ In this case, plaintiffs have established a prima facie case of age discrimination by demonstrating (1) that they belong to the statutorily protected age group, (2) that they were qualified and eligible for substantial pay increases in 1977, (3) that their 1977 pay adjustments were minimal or nonexistent, and (4) that some younger employees received the pay increases that plaintiffs expected to receive. *See generally Cuddy II,* 762 F.2d at 122; *Cuddy v. Carmen ("Cuddy I"),* 694 F.2d 853 at 856–57 (D.C.Cir.1982) (alleged failure to hire); *Krodel,* 748 F.2d at 706 (alleged failure to promote); *Coburn,* 711 F.2d at 342 (termination). Thus, they have "created an inference that, absent *any* evidence to the contrary, [defendants] acted for discriminatory reasons" in setting plaintiffs' pay increases as they did. *See Krodel,* 748 F.2d at 706.

To explain their challenged conduct, defendants have contended credibly, reasonably and forcefully that plaintiffs' pay was set in accordance with the outcome of considered and comprehensive evaluations

which did not take age into account. The evaluation process is described above in detail as to each individual plaintiff. Clearly, certain tension and bias borne of conflicts between those supplying information to the reviewing committee and various of the plaintiffs, as well as other subjective factors, seeped into the evaluations. As demonstrated above, some recommendations supplied to the reviewing committee and acted upon by that body were at times inexcusably cavalier, flippant, and infected with a lack of sensitivity to the plaintiffs' positive attributes, but they had nothing to do with age. Other recommendations were based on prejudiced positions, including disdain for certain contributions to the agency, and influenced by varying styles of management, but the evidence does not support the plaintiffs' contention that age affected the evaluations in any way.

Regrettably, the Court is not in a position to remedy blatantly unfair treatment which does not run afoul of an antidiscrimination statute (in this case, the ADEA), *see Coburn,* 711 F.2d at 345: "the fact that a court may think that the employer misjudged the qualifications of the [plaintiffs] does not in itself expose him to liability." *Burdine,* 450 U.S. at 250, 101 S.Ct. at 1092; *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1012 n. 6 (1st Cir.1979). In sum, the evidence simply does not establish that age was "a determining factor", or even *a* factor, and plaintiffs have not carried their burden of proving by a preponderance of the evidence that the defendant's asserted legitimate reason was a pretext.

Accordingly, judgment must be entered in favor of the defendant and against the plaintiff, and each of the nine other parties in interest who are similarly situated.

Despite the ruling, it must be said: these plaintiffs symbolize the real strength of our nation. United in dedication to the pursuit of freedom through knowledge, explorers into the unknown, brilliant, innovative and sensitive, they have shaped, and promoted, the future of us all.